THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* CITY OF SCHENECTADY, Defendant.

Supreme Court, Trial and Special Term, Schenectady County, March 18, 1946.

386

*Nathaniel L. Goldstein*, Attorney-General (*Edward R. Murphy*, *Arthur W. Mattson* and *Joseph A. Drago* of counsel), for plaintiff.

*Arlen T. St. Louis*, Corporation Counsel (*Kelsie E. Mead* and *Hannibal Pardi* of counsel), for defendant.

DEYO, J. This action, novel to say the least, was brought by the State of New York against the City of Schenectady to recover on an implied contract to reimburse the State for certain revenues it had lost by decreased power production at the State's dam at Vischer Ferry.

Prior to January 1, 1944, the city obtained its water supply from wells sunk in the water bearing gravel strata adjacent to the Mohawk River a few miles upstream from a hydro-electric plant which the State owned and operated at Vischer Ferry. During various periods in 1936, 1940, 1942 and 1943, the water in the city's wells became dangerously low, where-upon the State, at the request of certain city officials, namely, the City Manager, the City Engineer and the Engineer in charge of the Department of Water, placed " flash boards " on the top of the Vischer Ferry Dam, thereby raising the head of water which in turn raised the level of water in the city's wells and relieved the emergency. In doing so the State neces-sarily curtailed the production of electric energy during these periods, and thus it was deprived of the revenues it was accus-tomed to receive from the sale thereof. From the very outset the State insisted that it be reimbursed for the loss of these revenues. Bills were sent to the city and demands for pay-ment were repeatedly made, all of which was brought to the attention of the Common Council. Throughout this period, however, the city officials contacted, took the position that although " the policy of the city is to meet its just and legal obligations," they had no authority to bind the city and that the question of reimbursement was for the Common Council, which body in fact, never took official action in regard to the matter.

The complaint sets forth and the action was tried on the theory that the State, in raising the level of water at the dam, acted under and pursuant to an implied contract with the city for reimbursement for the revenues lost thereby. Apart from general denials of all material matters, the answer sets

forth four affirmative defenses based on noncompliance with certain charter and statutory provisions relating to contracts with municipalities, and one affirmative defense based on the Statute of Limitations. Both at the close of the plaintiff's case and at the close of the defense, the defendant by appropriate motions, raised the legal questions involved by the plaintiff's failure to allege or prove compliance with these various charter and statutory provisions upon which motions decision was reserved and the question of fact as to the existence of an implied agreement to reimburse the State for the loss of revenue was submitted to the jury. The jury found in favor of such an agreement for the years 1940, 1942 and 1943, and assessed damages in the amount of $15,048.03, but denied any recovery for the year 1936. It was the loss sustained in that year which the defendant claimed was barred by the Statute of Limitations, thus disposing of the legal question raised by the fifth affirmative defense and the motions relating thereto. Decision on the defendant's motion to set aside the verdict was also reserved.

It must, of course, be recognized that cities generally, and Schenectady in particular, owe their existence to statute, and that neither the city nor its officials have any greater powers than are therein prescribed. It is also well understood that the various statutory safeguards and restrictions placed upon the authority of a city to incur debt and expend public funds, as a general rule, must be scrupulously observed. However, a municipal corporation, like a private corporation or individual, can be bound by implied contracts " to be deduced by inference from corporate acts, without either a vote or deed or writing ". (*Peterson* v. *Mayor of New York,* 17 N. Y. 449, 453; *Port Jervis Water Co.* v. *Port Jervis,* 71 Hun 66, affd. 151 N. Y. 111; 3 McQuillin on Municipal Corporations [2d ed. rev.], § 1364, p. 1314; 44 C. J., Municipal Corporations, § 2247.) Although the principle seems clear, the practical application of it is fraught with considerable difficulty; for even in the field of implied contracts, statutory and charter provisions to which municipal corporations owe their existence, and which circumscribe their powers, must not be violated. Speaking generally, the implied contract must fall within the scope of the corporate powers and may not be one which by charter or statute must be made in a particular way. (*Kramrath* v. *City of Albany,* 127 N. Y. 575, 581.)

The late Chief Judge IRVING LEHMAN, in *Seif* v. *City of Long Beach* (286 N. Y. 382) although recognizing the applicability

of the doctrine of implied contracts to municipalities, phrased the restrictions thereon as follows (p. 387): " Where the Legislature provides that valid contracts may be made only by specified officers or boards and in specified manner, no implied contract to pay for benefits furnished by a person under an agreement which is invalid because it fails to comply with statutory restrictions and inhibitions can create an obligation or liability of the city."

In the instant case there seems to be no question but that the City of Schenectady had the necessary power and authority to contract for sufficient water to satisfy the needs of the inhabitants. (General City Law, §§ 19, 20, subds. 7, 12, 13; § 21.) The controversy really arises over whether such power was properly and legally exercised.

The duty of providing " an abundant supply of pure and wholesome water for public and private use " is specifically delegated to the Commissioner of Public Works. (Schenectady City Charter, § 17; L. 1907, ch. 756; Second Class Cities Law, § 94.) He is authorized to " adopt plans " for the acquisition of additional supply, to be submitted to and approved by the Common Council and the Board of Estimate and Apportionment. (Schenectady City Charter, § 19.) Under the Plan C form of government, the duties and prerogatives of the Commissioner of Public Works devolve upon the City Manager. (Optional City Government Law, §§ 90-92, as added by L. 1914, ch. 444.\*) It was, therefore, the City Manager who was specifically directed by statute to make the necessary arrangements for an adequate supply of water, and who, in fact, took part in the various conferences and carried on the correspondence from which the implied contract sprang. What was not done, however, was to submit the matter to the council and Board of Estimate and Apportionment and obtain their official approval. Such omission is not always fatal. In *Port Jervis Water Co.* v. *Port Jervis* (71 Hun 66, *supra*) favorable action by the village trustees was not only lacking, but in fact, such board had rejected the plaintiff's claim, and yet the court held that an implied contract to pay existed.

Lack of formal action by the Common Council and Board of Estimate and Apportionment was not fatal in the case

---

\* Repealed by chapter 765 of the Laws of 1939, which, however, provided *that* where a plan of government specified in the Optional City Government Law was in force in any city on January 1, 1940, the plan and all portions of the statute applicable to said plan were continued in full force and effect until repealed or superseded by a local law enacted pursuant to the City Home Rule Law.

at bar. The evidence clearly discloses that the council had full knowledge of the situation and that they must have been fully cognizant that the State demanded and expected reimbursement and had, in fact, delivered an ultimatum to that effect. Moreover, in each instance when the State was called upon for aid, the city was confronted with an emergency; time was of the essence; delay might well result in catastrophe. Under such circumstances, I am of the opinion that the Legislature never intended the statutory requirements for formal action to apply. (*Staten Island Water Supply Co.* v. *City of New York,* 144 App. Div. 318.) As was said in *Brooklyn City Railroad Co.* v. *Whalen* (191 App. Div. 737, 742, affd. 229 N. Y. 570): '' An emergency may justify the omission of prescribed conditions to the exercise of municipal power. This doctrine rests on the reasoning that the Legislature, in granting the power and prescribing methods of and conditions to its exercise, could not have intended such conditions and methods to apply to cases where it is impossible to meet them. The important point is that the municipality has the power; the method of its exercise is a secondary consideration. And in times of stressing emergency, when prompt action is required for the public welfare, it is better that methods and conditions be unfulfilled than that the municipality should fail to act.''

The defendant urges by answer and motion that the failure to comply with other statutory restrictions and inhibitions made a valid contract impossible. In the first place, it is pointed out that no appropriation was ever made to cover the moneys herein involved. Sections 75 and 76 of the Second Class Cities Law provide for annual estimates and appropriations for the expenses of operating a city. Section 79 prohibits any officer, board or department from entering into a contract involving the expenditures of money '' for any of the purposes for which provision is made in the annual estimate in excess of the amounts appropriated ''. Since the contract in question did not involve the expenditure of money *for any of the purposes for which provision had been made,* there is considerable question whether or not the section has any application whatsoever. (*People ex rel. Kiehm* v. *Board of Education,* 198 App. Div. 476.) But even if this were not so, the exigency of the crisis with which the city was confronted would take the case from out the operation of the statute. Moreover, as was pointed out in *Port Jervis Water Co.* v. *Port Jervis* (71 Hun 66, *supra*) and *Kramrath* v. *City of Albany* (127 N. Y. 575, *supra*) under proper circumstances and despite restrictions similar to those herein involved, a liability may nonetheless be incurred by implied contract, in advance of an appropriation.

Section 120 of the Second Class Cities Law, which provides that "all contracts for the performance of any work or for the supply of any material required " shall be let to the lowest bidder, does not seem to me to have any application to the contract under consideration. Certainly the instant contract was not for labor, and it seems equally clear that it was not for material. Water is a commodity to be consumed, somewhat like electric current or gas, which, it will be noted, are specifically placed under the supervision of the board of contract and supply by section 122. There is no similar section covering water. *Harlem Gas Co.* v. *Mayor of N. Y.* (33 N. Y. 309) seems decisive on this question. There it was held that a contract for the lighting of public buildings and streets was not within the scope of the charter provision requiring contracts for labor, supply and materials to be let on bids to the lowest bidder. The court therein pointed out that even if the charter provisions could be construed as including all possible kinds of service which the city might need, it still should not be interpreted as applying to gas, because such application could not have been intended. The court said on this subject (p. 330): "Whenever the nature of the service, or of the property needed for public uses, or the time within which it must be had, to prevent irreparable mischief, under competitive offers is impossible, then the provisions of the acts referred to cannot apply, because such could not have been the intention of the lawmakers, and such emergencies were not amongst the mischiefs which the provisions referred to were designed to correct." In that case, as in the one at bar, the plaintiff was the only source from which the commodity could be obtained, and on that subject the court said (p. 331): "Had the common council * * * invited proposals in the usual form, there could have been but a single offer at best, and the provisions of the statutes would have failed of effect because they were not applicable to such a subject."

Pursuant to section 55 of the Second Class Cities Law and section 51 of the Optional City Government Law (L. 1914, ch. 444), the authority to sign contracts is vested in the mayor. These provisions obviously relate only to express contracts. Here we are concerned with an implied contract which no one signed. Under the Plan C form of government the actual signing is at best purely a ministerial function. It is the City Manager who is the actual head of the city government. (Optional City Government Law, §§ 90–92; L. 1914, ch. 444.) It was he and his subordinates who took part in the conferences and carried on the correspondence resulting in this

contract. It is he or his appointees who are specifically charged by statute with the duty of seeing to it " that the city has an abundant supply of pure and wholesome water for public and private use ". (Second Class Cities Law, § 94.) The mayor, as a member of the council, shared in their knowledge of the situation. His acquiescence in what transpired, and his acceptance in his official capacity of the help which the State rendered in the light of the circumstances under which it was given, more than make up for the lack of his signature on some written instrument. The situation is very similar to that presented in *North River Electric Co.* v. *New York* (48 App. Div. 14). There, the municipal assembly had refused to pass ordinances for lighting the city. The Commissioner of Public Lighting, in order to prevent the city from being left in darkness, made an oral agreement with the lighting company. The court held that the failure to execute a written contract in the particular way and manner prescribed by the charter was not fatal to the company's right to recover. In the case at bar, the evidence proves and the jury has found that there was an implied contract and here too, it will be held that the absence of a writing signed by the mayor is not a bar to recovery. The words of the court in the *North River Electric Co.* case (*supra*, p. 26) are equally applicable here. "Upon the agreed facts here, there was shown a great public necessity and an emergency not contemplated by the statute; one which would not permit of delay, but required immediate action by the defendant to protect its interests, as well as the lives and property of its citizens. There being, therefore, no attempt to override the statute, or to do that which it prohibited, and a situation being presented to which the statute did not apply, we think the plaintiff may invoke the rule of liability similar to that relating to an implied contract."

Section 64 of the Second Class Cities Law, as amended by Local Law No. 4 of 1925 of the City of Schenectady, in its application to said city, provides that claims shall be verified, approved, audited and allowed by the comptroller. No such claim was filed or audited in the instant case, and on the authority of *Port Jervis Water Co.* v. *Port Jervis* (71 Hun 66, *supra*) it was not essential to the validity of the contract.

Although the foregoing seems to indicate that noncompliance with the various charter and statutory provisions should be excused in the instant case, there is still a broader ground upon which the implied contract should be held valid.

The ancient maxim that a king can do no wrong, and that a sovereign, as the fountainhead of all law, is not himself bound by such laws as might be promulgated for his subjects, has continued to be recognized even in our democracy, which knows no king, and whose sovereign is the State itself. Despite the present day tendency to encroach upon the age-old concept of governmental immunity, it is still generally recognized " that a statute does not apply to the state, where its sovereign rights, prerogatives, or interests are involved, unless it is specifically mentioned therein or excluded by necessary implication " (McKinney's Cons. Laws of N. Y., Book 1, Statutes [1942 ed.], § 115).

In raising the level of the Vischer Ferry Dam, the State was exercising one of its sovereign prerogatives in the interests of a portion of its citizens, the residents of Schenectady. The protection of that group of its citizens from possible calamity arising from a shortage of water, clearly involved the " interests " of the State. I grant that the operation of a hydro-electric plant is not a sovereign act, and in matters connected with the sale of the power thereby generated, the State should stand on an equal footing with private enterprise. Such is not the case here, however. The State is not seeking pay for energy furnished the city; it is seeking to be reimbursed under an implied contract which the jury has found to exist for protecting the residents of Schenectady from imminent danger and misfortune. The fact that the measure of damages agreed upon happened to be the loss of revenue which the State suffered, seems to me to be only incidental. This implied contract was, in effect, an agreement between the State and one of its subdivisions to furnish water necessary for municipal purposes. Can it be seriously argued that it was not for the benefit of at least a portion of the State, i.e., the citizens of Schenectady, that such water be furnished? Can it be said that in so doing, the State was merely engaged in a business enterprise for profit? Clearly, the answer must be no to both interrogatories. It is, of course, a prerogative of the sovereign and clearly within its interests to ward off a possible epidemic, to guard against a possible conflagration, to protect its citizens from possible disaster. It must be equally apparent that this was the very purpose of the implied contract. Having secured the benefits and having thereby averted a threatened calamity, the City of Schenectady, now that the danger is past, seeks to avoid the agreement which the jury has found it entered into. The city's

argument that the State must be governed by the same rules of common honesty and justice which bind individuals, has a hollow ring, when we consider that the city itself is seeking escape from these very rules. This principle of governmental immunity from the effect of its own laws, unless the State is specifically mentioned, has been applied in many varied actions. In *Denton* v. *State of New York* (72 App. Div. 248) it was held that the rights acquired by the State to build a reservoir for canal purposes were not prejudiced by subsequent legislation declaring the same river to be a public highway for the passage of logs, where the latter statute had not expressly named the State. The court said (p. 251): " ' General words in a statute do not include nor bind the government by whose authority the statute was enacted, where its sovereignty, rights, prerogatives or interests are involved. It is bound only by being expressly named or by necessary implication from the terms and purpose of the act.' "

In *Robinson* v. *State of New York* (150 Misc. 593) it was held that certain sections of the Labor Law requiring the installation of safety devices on machinery in factories, did not apply to prison workshops. This holding was subsequently reversed (242 App. Div. 94) on the ground, however, that the enabling act supplied the necessary reference to the sovereign. Simi-larly, it was decided in *Jewish Hospital of Brooklyn* v. *" John Doe "* (252 App. Div. 581) that the same rule would exempt a charitable organization carrying out a governmental function, from compliance with section 876-a of the Civil Practice Act, and that the court could, therefore, grant an injunction *pendente lite* in the plaintiff's favor, in a labor dispute, without a hearing. Prior to the enactment of section 292-a of the Civil Practice Act, it was repeatedly and consistently held under the same principle that section 288 *et seq.* of the Civil Practice Act did not authorize an examination before trial where the defendant was a municipal corporation. (*Kasitch* v. *City of Albany*, 283 N. Y. 622; *Rucker* v. *Board of Education*, 284 N. Y. 346; *Bush Terminal Co.* v. *City of New York*, 259 N. Y. 509; *Berryman* v. *Board of Education*, 257 App. Div. 915; *Mack* v. *School Board of Briarcliff Manor*, 171 Misc. 165.) The case of *People* v. *City of Yonkers* (177 Misc. 406, affd. 267 App. Div. 959, affd. 293 N. Y. 880) bears a striking similarity to the case at bar. There too, the State was seeking reimbursement from the city, but in that case for fines improperly withheld, rather than for moneys due under a contract. There too, the city interposed as a defense the failure of the State to present a claim in the manner required by law, and there the court held that the State was under no compulsion to follow the statutory pro-

visions. In that case, section 244 of the Second Class Cities Law, having to do with the presentation of claims arising from tortious acts, was involved, while in the instant case, it is section 64 of the Second Class Cities Law having to do with contractual matters which, it is alleged, was violated, but as was said in *Marcy* v. *City of Syracuse* (199 App. Div. 246, 254): "These sections should be construed to be in harmony with each other." If the State is excused from compliance in one instance, it naturally follows that it should be excused in the other.

If it be assumed, as it must be, that the city had the inherent power to perform indispensable acts, such as providing its inhabitants with a supply of water, then the method of exercising such power, the manner in which it was done, what particular agency should let the contract, who should sign it, and what formalities should be followed, are purely procedural matters, and therefore, the statutes prescribing such methods are not binding upon the sovereign when its interests are at stake.

Another point raised by the plaintiff deserves attention. Subdivision 5 of section 20 of the General City Law, grants to every city the power "to pay or compromise claims equitably payable by the city, though not constituting obligations legally binding on it * * *." This is obviously an attempt on the part of the Legislature to give to municipalities the right to recognize moral as well as legal obligations. It will be noted that under this section there are no restrictions or inhibitions in the manner in which the granted power is to be exercised. An implied contract, arising as the one herein involved arose, to reimburse the State for the revenues it lost, would therefore seem to be entirely valid and binding on the city, for certainly the claim is just and equitable. Although the payment of such claims is customarily a subject for mandamus, there seems to be no reason why they may not be enforced by action. (*Boland* v. *City of Niagara Falls,* 178 Misc. 125; *Rondout Savings Bank* v. *City of Kingston,* 144 Misc. 880.)

Certain of the cases cited by the defendant are worthy of special reference. *Matter of the City of Buffalo* (78 N. Y. 362) and *Matter of City of New York* (*Boulevard*) (185 App. Div. 315) were condemnation cases and did not involve contracts, either express or implied. *Scarborough Prop. Corp.* v. *Briarcliff Manor* (278 N. Y. 370) held that under the then existing Village Law, a village had no authority to accept the dedication of a street, conditioned upon reimbursement to the owner thereof for certain improvements thereon. In other words, it was a question of lack of power. *Williams* v. *City of New York*

(118 App. Div. 756, affd. 192 N. Y. 541) denied a recovery of damages for failure to execute a contract when the action of the particular city agency was *ultra vires* under the statute, and the bid was in excess of the appropriation. No *ultra vires* act is involved in the instant case, and as has been pointed out, the exigencies of the moment excused the lack of appropriation. *Robinowitz* v. *City of White Plains* (269 N. Y. 670) was a fraud rather than a contract case. *Wooley* v. *City of Schenectady* (226 App. Div. 383) and *Seif* v. *City of Long Beach* (286 N. Y. 382, *supra*) concerned alleged contracts entered into by someone other than the agency which had been given specific authority in the particular field involved. In none of the cases cited by the defendant did it appear that there was an emergency requiring immediate action or that the sovereign was involved.

In accordance with the foregoing, all of the motions made by the defendant at the conclusion of the plaintiff's evidence, and renewed at the close of the entire case, together with the plaintiff's motion for a directed verdict, and the defendant's motions for nonsuit and to set aside the verdict upon all of which motions decision was reserved, are hereby denied.

Submit order accordingly.